May it please the court, Stephanie Ball on behalf of Tony Brill as trustee for the surviving next of kin of Richard Brill. As a Minnesota licensed insurer, Mid-Century Insurance Company has a statutory obligation to provide underinsured motorist coverage to its resident policyholders, and that obligation arises notwithstanding that a particular policy was issued, delivered, or renewed in the state of Minnesota. Here the district court sided with Mid-Century and held a coverage-restrictive position reading into some cases and statutes that a licensed insurer only has that obligation to its resident policyholders if a policy is renewed, issued for delivery, or delivered or executed in the state of Minnesota. Here that issue comes before this court de novo, and there are at least three reasons why respectfully the district court's decision should be reversed. First, the district court relied upon a Minnesota Supreme Court case called Cantu and concluded that that case was controlling on the issue before this court, and it is not. Second, it misinterpreted a case called Shasa, which is a Minnesota court of appeals published decision, which is actually directly on point, the case here. It not only misinterpreted Shasa, but concluded that even if Shasa conflicts with Cantu, it's not precedential. Are the facts in Shasa sort of case-specific in the sense that you have a woman who has informed her insurance agent, who's a captive agent of the company, that she's actually leaving and going to go live in Minnesota for the next three or four years, and then she's coming back to retire, and she unfortunately meets a fatal accident in Minnesota. And so you've got a case where the insurance company's got actual notice through one of their actual agents, and does that just make that case sort of sui generis, and if not, why not? Because I know you're going to say no. You're right, I'm going to say no, and I'll tell you why. Footnote two, on either page 561 or 562, the court specifically said, doesn't have anything to do with our analysis. So you're absolutely right on those facts, that those are the facts, but that was not the basis for the court's decision in Shasa. It focused solely on residency. So while you've recited those facts specifically, the court, in its opinion, expressly stated that has nothing to do with our analysis. And I'm glad you pointed that out, because the district court, in its opinion, actually sort of laid out those same facts, and was somewhat persuaded by that. And so from our standpoint, the answer is no, although those are the facts of the case, that's not what the case, what the court relied upon and said that in footnote two. Third, I said there were three reasons why the district court's decision should be reversed, is that it engaged in a flawed analysis of Minnesota statutes, again, respectfully so, which is at odds with Minnesota statutes and Minnesota's strong policy of extending, not restricting coverage. So where we believe the court went wrong is the path that it took, and why that path underscores why it arrived at the wrong answer. And here I'm encouraging this court to really review just a handful of opinions. I want you to look at Cantu. I want you to look at the Shasa decision. I want you to look at Hedrington, even though it's an unpublished decision, and the statutes that are at play. Where the court went wrong, the district court went wrong, is that it, one, it looked at Cantu and it said, well, the Minnesota Supreme Court has decided this particular issue. It did not. What Cantu involved was an insured that originally purchased coverage in Florida and then came to Minnesota. And when he purchased his coverage in Minnesota, in contrast to the facts of our case, he did not purchase uninsured and underinsured motorist coverage because it was optional in the state of Minnesota. And so you don't even get to our issue, which is, and which involves, excuse me, an insured that elected to purchase coverage, uninsured and underinsured motorist coverage in another state, and whether, when he becomes a resident of Minnesota, that should be conformed to land-on coverage rather than difference-of-the-limits coverage because that's Minnesota law. So Cantu did not even get to our issue. And as I pointed out in my brief, it's a little bit unclear, but Cantu may have even been decided based, because the Cantu decision cites AMCO, all caps, and Hauer, two decisions which, again, didn't have anything to do with the issue in our case, but had to do with how you interpret policies when there's a change in the law because they came down when Minnesota was, back in 1985, when Minnesota changed several provisions of the No-Fault Act. So there are two reasons why Cantu is not applicable. We do have the benefit, this court has the benefit, because you're guided by what would our Minnesota Supreme Court. That's your job, is to predict how our Minnesota Supreme Court would rule. So of course MidCentury wants to say the Minnesota Supreme Court has already ruled on this issue, Cantu. We say no, it hasn't, and you have the benefit of a persuasive authority, and that is SHASAL, which did go through a very thorough discussion of the statutes which are to play, which are 65B.50 in Subdivision 1. See, I get that, and I understand that argument, but I keep coming back to it. What about Freeze, where the Minnesota Court of Appeals didn't seem to be so convinced that SHASAL answered the question the way that you thought that you were arguing? Because Freeze involved a non-resident, and that's where, when I talk about where the district court went wrong, is that you could be persuaded all day long. Well, your client pled that he was a resident of Wisconsin at one point, and then turned around and pled later he was not a resident of Wisconsin. How can you do that? Well, he can be a resident of both states. Can you be a legal resident of both states? Is that possible? Is there, I mean, dual residency? There's such a concept. I didn't know we were going to talk about that so much today, but it is in my brief. There are several Minnesota cases. What you can't have is you can't have two domiciles, but you can have dual residency. So you can be a resident of both, he can be a resident of even more than two states, but you can't have dual residency. And there are several cases that we've cited in our brief on that topic. Counsel, even assuming that, I don't believe there's any evidence in the record that MidCentury knew that Richard was residing in Minnesota. Doesn't that place them and other insurers in a position of not knowing how to set their rates? Well, it may, but Minnesota has statutorily, and for public policy reasons, has a statute in effect that says regardless of what impact that may have on premiums, as a condition to coming to Minnesota and having the right to sell business in the state of Minnesota, you agree, you insurance company agree that you are going to be bound by our coverage obligations. So that might be so, that an insurer, if it doesn't have knowledge of where it's insured is going to be a resident, that that may affect our premiums. It's basically a statement of our state's public policy and statutes that we require that of our licensed insurers. So for example, one of the cases that MidCentury cites is a case called Aguilar v. Texas Farmers, and there the insurer didn't have an obligation because it wasn't licensed in Minnesota. So it wasn't subject to our public policy and statutes. So what I would point out is that where the court took a path that led it to the wrong conclusion is it read the cases that MidCentury cites, and there are a lot of them, because its brief is primarily dedicated to that, Petty, Hedin, Aguilar, the freeze decision, and a case called Ziegelman, but those all had to do with non-residents. And so the analysis ends there because our statute and our cases explicitly recognize that licensed insurers owe lesser obligations to non-resident policyholders, and that's a way to rely upon whether the policy was issued, delivered, or issued for delivery, or renewed. In fact, it says it didn't, and in that case it could not because the policy had been issued in North Dakota. So any suggestion that that should be a limitation right into the chasseau court's decision is just not supported by the pinnate itself, and I'd encourage you to read pages 561-562. So here, the appellant asks this court first to reverse the district court decision because it's at odds with Minnesota statutes. That's the statutory analysis that should be engaged in here, that it's not guided by the CANTU decision, and that chasseau is directly on point, and that any of the other cases that are cited don't have to deal with the issue in this case. And I see I'm at my time where I've reserved for rebuttal. Thank you. Thank you. Mr. Elm. Thank you, and may it please the court. My name is Brock Walton. I'm here today on behalf of Appelli Mid-Century Insurance Company. As the court is aware, this case does ask whether or not a putative resident, I think there's a question of fact with respect to the motion for summary judgment filed by appellant, a putative resident of Minnesota automatically has their insurance policy written up to conform with Minnesota law, which provides that coverage for underinsured motorists must be provided on an add-on basis. This policy was purchased in Wisconsin, where limits less paid is permissible, and that's the language in the policy. I'm going to start with chasseau, because the court has a clear interest in it, and that footnote two just discussed by counsel. I believe we were looking instead at footnote three, just based upon the language of each, and what the court stated, which is that they were not going to reach the issue raised by the panel, because they were instead deciding that the case was determined by section 65B.50, not section 65B.49. That's again a statement of the court in footnote three. That, your honor, or your honors, is the issue with the chasseau decision in brief. This is a statutory interpretation question, and they interpreted only one of two statutes, 65B.50, and in particular subdivision one. All subdivision one states is that an insurer must indicate that it will provide the benefits provided in a different section, section 65B.49. It doesn't state what those benefits are. You have to read 65B.49 to come to a conclusion concerning what they are, and this is a statutory interpretation question, but it's one that's been decided repeatedly by Minnesota courts, and that is that under 65B.49 subdivision 3A, no underinsured or uninsured motorist coverage must be provided to an out-of-state resident, and, and this is the point of canto, a policy purchased by an out-of-state resident will not be conformed to Minnesota law until that policy is renewed, delivered, issued, or issued for delivery in Minnesota, and canto does, therefore, control. There's a discussion in chasseau that attempts to distinguish canto on the fact that it's an uninsured motorist case. There is really no basis to do so. The statute, section 65B.49.3A, applies to both. The language is exactly the same. There is no distinguishing factor there, and really what both the chasseau court did and what Ms. Brill is asking this court to do is skip that section and jump instead to section 4A, which provides that add-on coverage must be provided. There's one case that, that counsel didn't bring up. It is a case that involves a Minnesota resident, a Minnesota resident from the time the policy was purchased all the way throughout, and that's Johnson v. Comiskey at 765 NW 2nd 652. It's a Minnesota Court of Appeals case, and it's from 2009. It's a very helpful case in that it discusses at length the history of these provisions, but it also takes head-on this argument that if a policy does provide some uninsured, excuse me, underinsured motorist coverage, it must provide it on an add-on basis, and answers in the negative. The context is slightly different. It's a motorcycle policy. Motorcycle policies don't have to conform with the No Fault Act, but farmers nevertheless sold limits less paid insurance coverage in that policy. After an injury and after an accident, the insured argued that instead the policy had to conform with Minnesota law and provide add-on coverage, and again, the court directly took on the issue. One big piece of the decision is a determination as to whether or not you can skip over subdivision 3A, which says when coverage must be provided, and go straight to subdivision 4A, which says how it must be provided. And again, the court said, no, you cannot do that. They must be read together. The summary, the court's ultimate statement, I think says it all. What it said was, the context, history, and analogous case law regarding the operative subdivisions in section 65B.49 lead us to conclude that courts may not rely on subdivision 4A to expand a policy's UIM coverage unless the coverage itself is required by law. OK. What Ms. Brill is asking, and what the Shassau court did, is essentially skip over the question of whether or not coverage is required by law. The answer in this case is no. That's why I can't do controls, again, because this policy wasn't renewed once this individual,  I do think it's important that the Shassau plaintiff was a resident of Minnesota at the time the policy was issued. I'll note that the case takes pains to say it wasn't issued, quote, in Minnesota. It wasn't renewed in Minnesota. It wasn't executed in Minnesota. I presume that means that those events took place at the agent's office, but it was issued to a Minnesota-insured living in Minnesota at the time of issuance. And the district court in this case synthesized it with the other cases on that basis. I think there might be a question at some point where an insurer could challenge that determination. I don't think that an insured, however, can use it to expand coverage where a policy was issued to a Wisconsin resident without question at time of issuance. I also don't think we can lightly set aside the two cases relied upon by CANTU. Those cases, again, with the AMCO case and the Hauer case, for two reasons. First, the language used by the legislature as they change these laws mirrors that in 65B.49 subdivision 3A itself. So one of the two cases, AMCO involved what's called stacking coverage, and whether or not two vehicles could be listed on one policy and be subject to one limit, or if you had to add that limit essentially together twice. In that case, the policy issued, the law was changed, the policy wasn't yet renewed after the change of the law and the accident occurred. And what the court said is, given that the policy hadn't yet renewed, the law wasn't effective, and the anti-stacking provision in the policy would not be effective either. Again, the reason why that's important is, the language used by the legislature is, that the law would become effective once the policy, quote, was renewed, issued for delivery, delivered in, or executed in Minnesota, the same language you're dealing with in this case. Hauer was the opposite. In that case, actually the mandate for underinsured motorist coverage was removed from statute, same language was used, the policy changed, then the accident, excuse me, the policy renewed, then the accident occurred, and the court said, no, you can't read coverage back into this policy, because the event had occurred that mandated a change. Here you don't have that event after Mr. Brill moves from Wisconsin into Minnesota. Counsel, what if the Brills picked up the phone and notified their agent that Richard was residing in Minnesota prior to the accident, would that make any difference? Well, I think it may make a difference in that a policy might then have been reissued. I mean, that's what should happen at that point. The agent should change coverages, and everything would then conform with Minnesota law, because you'd receive a new deck page stating what the changes are, and potentially a new policy, period. But, if the agent took that phone call, hung up, and didn't do anything, I don't think it would make a change, Your Honor, and I still don't think the case would then be in all fours with Shassow, where you had a resident of Minnesota at the time of issuance of the policy. Well, the language of the policy itself is permissive under the circumstances described by Judge Gross, because it allows cancellation of the policy if there's a change in circumstance that changes the risks of the insured, of the insurance company, the insurer. Correct. That's what the language says. You know, and so, obviously, if the agent never answers the question and hangs up, he's the company's agent, and the company's elected not to take action under the policy provision, right? Correct, Your Honor, but that doesn't... And then you're saying it just doesn't matter as far as your argument's concerned. Well, not my argument, but it can, too, because you still wouldn't have any of those events that would occur that would make this policy conform to Minnesota law. Again, it's just a statutory reading exercise, really, and the statute doesn't say if you call your agent and he ignores it or the policy doesn't make a change that there's automatic conformance, nor is there any case law that I'm aware of, although, again, SHASA does make reference to, of course, that fact. I do want to say, too, that SHASA would be out of accord with Minnesota law in Supreme Court decisions, not just based upon CANTU, but based upon, for instance, Petty, which, let me get the court the citation. It was one of the early decisions on this question, it's 290 NW 2nd 763, the Minnesota Supreme Court established in that case for the first time that underinsured motorist coverage need not be provided at all to out-of-state residents. That's the main decision in the case. But what it does in coming to that conclusion, it says, how do you read these statutes? Can you just read 65B.50 and make a determination on coverage? The answer is no. You have to look specifically at 65B.49. The SHASA court essentially rejects that. To the extent it does so, it's rejecting the Supreme Court's opinion improperly. And it doesn't take control of this court, as the court knows. It looks to what the highest court of the state would do, not what a lower court would do. It's certainly not alone in that regard. I mean, that's been reaffirmed repeatedly. Cases are cited throughout the brief, as the court is aware. It really is the one case that's out of step with the others. And it does seem to me that the court had in mind some of the issues raised by the panel, the fact that we have an agent that is well aware of the move, and of course, a Minnesota resident. And frankly, I think there was a reasoning it could have applied that would synthesize it with other decisions. And I think the district court did that here, which is a policy issued to a Minnesota resident, whether or not the physical copy of a cross is into the state of Minnesota, is issued in Minnesota, or issued for delivery in Minnesota. That's the way that case probably should have been decided. That's not exactly what the court said. Just briefly, there was a second question, or excuse me, a second argument raised in briefing concerning whether or not this should be certified to the Minnesota Supreme Court. I do think this is an important issue. I think it's an issue that's been decided already, and so I don't think certification is appropriate in that regard. And as referenced earlier, there were cross motions for summary judgment in the case, sort of through the district court for a loop. But to the extent that this ruling is reversed, I believe there's a question of fact on residency that still needs to be decided. So it would need to be remanded to the district court rather than reversed in full. But at the end of the day, this is a question of how much money Mid-Century Insurance owes to this insured, whether it's limitless paid, or whether write-up coverage and Minnesota law applies. For all the reasons previously argued, Mid-Century believes that it does not. And unless the panel has any other questions, we would ask that you affirm the decision of the district court. Seeing no questions, thank you very much. Thank you. All right. First of all, I stand corrected. It's footnote three in SHASO. That is the one that I meant to reference in my earlier argument, and my apologies for that. First, let's talk about the CANTU decision in light of arguments made by Mid-Century. CANTU specifically refers to 65B.39 Subdivision 3A.1. That statutory provision has to do with Minnesota's requirement that an insurer provides separate uninsured and underinsured motorist coverage. In other words, it's mandatory in the state of Minnesota. And that was what was at issue in CANTU because the insured came to Minnesota without any uninsured and underinsured motorist coverage. So the insured in that case was saying, reform my policy to include this coverage. It was not a question of reform the policy, reform a policy which already includes separate underinsured and uninsured motorist coverage, and conform it or reform the policy so that it conforms with Minnesota law. And that's the issue in our case, which arises under 65B.50 Subdivision 1 and 65B.39 Subdivision 4A. Now in, again, talking about the path to why the district court got to the wrong answer, and has advocated by mid-century, is that it relies upon a host of decisions that really have nothing to do with this case. And one of them, which I did not discuss on my initial argument but was raised by mid-century, is the Johnson v. Kumiski case, which is a case that involved motorcycles. And in Minnesota, we do not require uninsured and underinsured motorist coverage for motorcycles. So the provisions that we're talking about, including 65B.50 and 65B.49, which have to do with motor vehicles, which are statutorily defined to exclude motorcycles, again, that analysis is not helpful to getting to the correct answer in this case. Now, they focus on the gratuitous analysis done by the court in that case, which we actually think helps our position in this case, because it talks about where underinsured and underinsured motorist coverage is required by law and where it's not. And here it is required by law, so you engage in a different analysis. The last issue that I would like to discuss is that this is an important issue, and it's an issue that is, in our view, is going to be repeated. It involves analysis of statutes, and it also involves public policy of the state of Minnesota, because, as I pointed out earlier in response to some of the questions by the court, this is in part a matter of public policy that we require, we, the state of Minnesota, require licensed insurers to provide add-on underinsured motorist coverage. And so what we are advocating, and the alternative to this court deciding, is that you certify the issue for decision by the Minnesota Supreme Court, and that may be particularly helpful here, because Mid-Century views this case as all about can-too, and we respectfully think it not, so why not let the Minnesota Supreme Court weigh in on the scope of its own decision? Thank you. Thank you. John, do you want to break? Do you? OK. Well, the clerk will go ahead and call the next case. Thank you very much for your argument and your briefing. It's been very helpful, and we'll take the matter under advisement and get back to you shortly.